NEIDER et al. v. HIGGIN MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. December 18, 1908.)

No. 1,805.

PATENTS (§ 328*)—ANTICIPATION—TUFTING BUTTONS FOR CUSHIONS.

The Neider patent, No. 630,553, and the Marggraff patent, No. 695,468, both for improvements in tufting buttons for cushion seats, consisting of strengthening the base of the prongs which are passed through the material and clinched, so that the bending point, when clinched, will be at some distance from the head of the button where the metal has not previously been weakened by bending, conceding that the improvements involve invention, are void for anticipation by the Jensen patent No. 377,029, for a paper fastener.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Eastern District of Kentucky.

W. F. Murray, for appellants.
Wm. H. Fisher and F. A. Faber, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. This is a bill to restrain infringement of patent No. 630,553, granted to Fred A. Neider, and of patent No. 695,-468, granted to Frederick Marggraff, both assigned to the complainant corporation. Both patents are for improvements in tufting buttons for cushion seats. Both are clinching buttons, and consist of a head with two outwardly projecting metal prongs which are passed downward through the material forming the cushion and are then bent back over the back, or under, side of the cushion. Such clinching buttons were well known before the Neider patent, and, as his specifications state, had been stamped out of sheet metal; the prongs being of uniform width from the back to the tapered point. A well-known form of such button, prior to Neider's patent, is shown in the Pitner button; a side and perspective view being seen in figures 1 and 2, set out below. Similar views of the improved Neider button are shown in figures 3 and 4, all being taken from correct representations in brief of the solicitors for appellees.

FIG. 1.
Pitner Button—Side View

FIG. 3.
Neider Button—Side View.
See Fig. 2 of his patent.

FIG 2.
Pitner Button—Perspective View

FIG. 4.
Neider Button—Perspective View

FIG. 5.

In each figure A represents the cap, or head; b indicates the clinching prongs. Fig. 3 is an enlargement of Fig. 2 of the Neider patent. Fig. 5 is an enlargement of Fig. 3 of the same patent.

The only visible difference between the Pitner button, which is a fair type of well-known forms of such buttons, and the improved Neider button, is that the prongs on the latter button are tapering from the base up to the point $b^2$, from whence they are of uniform width until they slope at their termination to form a point for penetrating the material of the cushions, while the Pitner prongs are of uniform width from the base or back down to the same sloping point. This widened and tapering base was Neider's improvement over the old art. The purpose and consequences of this change we shall see later.

The Marggraff improvement followed the general lines of Neider; but, instead of widening the material in the prong at its base, he struck up a rib where Neider had widened his prong. The defenses are no invention, anticipation, and no infringement. The Circuit Court found that both Neider and Marggraff had been anticipated by an earlier patent to Jensen, being patent No. 377,029. It is clear that the Marggraff patent cannot stand if that of Neider is void for either noninvention or anticipation by Jensen. We shall, therefore, refer only to the Neider patent hereafter.

The trouble with the uniform pronged button was that its weak point was at the juncture of the prong with the back or base of the button, due to crystallization of metal there occurring in manufacture when bent up to form the prongs. Neider says in his specifications that it had been found in use that buttons so made had, when their prongs were turned over on the upholstering material, "an inclination to bend near the body of the button back, * * * which in use brought all of the strain upon the clinching prongs at their base or juncture with the button back," and that they "had a tendency to straighten out or break off" at this bending point near the body of the button. The object of his invention, he adds, "is to overcome this defect and form the tines or clinching prongs with a heavy base back of the button disk, and taper their base down to a point some distance from the back of the button to its junction with the straight or parallel sides of the tines, so that in bending the inclination is at the base of the tapered base forming practically a neck for the button between the button back and the angular bend of the tines when turned over the button on base of the cushion, whereby the strain upon the button and the tines is a direct strain, having no tendency to break the clinching prongs near the base of the button nor to straighten them out beneath the cushion base." In Fig. 5, as shown above, Neider indicates his bending point at $b^2$, and in his specifications indicates that the termination of the tapering base "determines the line at which it is bent at a right angle to the base to pass through the perforations" in the cushion material. In actual practice the bending point is not always at the point indicated. That it will be so, if the thickness of the material is less than that of the wide tapering base, is likely; but, if otherwise, the bending point in actual use, as shown by the evidence, is determined by the thickness of the upholstering material over which the prongs

are pressed down or clinched. The only claim which is here asserted is the second. That reads as follows:

"The hereinbefore-described tufting-button consisting of the cap having clenching-prongs projecting from its back, said clenching-prongs having an enlarged base tapering to the parallel sides of the clenching-prongs, substantially as shown and described."

It will be seen that this claim is not limited to a button having an arbitrary bending point at the termination of the widened tapered base, though the inventor evidently supposed this to be the case from his description of his invention. What Neider did, shortly put, was to strengthen the base of the well known clinching prong of the commercial cushion clinching button. The base was the weak point, because there the metal had suffered more or less crystallization in manufacture. The bending point of such a prong was likely to be at the crystallized base, its weak point. That point he strengthed by widening the material there and tapering the widened base. From this widened base he made his prongs of uniform width. By this device the bending point would occur above this tapered and crystallized base—a point determined by the thickness of the material under the clinching prongs. If we assume that invention is involved in so constructing such clinching prongs as to determine a point of bending, the idea was anticipated. This is best illustrated by the Jensen fastener, made under his 1888 patent, No. 377,029. The Jensen device was for a paper fastener. We show below figures 1, 2, 4, 5, and 6 from his patent.

His object was to determine a bending point below the connecting bar, c, joining the two prongs together, as he had found in use that the prongs were likely to break at the point of juncture with the connecting piece. Instead of thickening or widening, or otherwise strengthening, the prong at this point of juncture, he weakened his prong at a point below by cutting the notch, d, in the inner edge of each prong near the upper end thereof. He adds:

"By the notches, d, at the bending point, which slightly weaken the metal and allow of this nearly square bending of the prongs, and by reason of this square bending the connecting piece, c, is not so liable to be broken off as when the prongs are bent back in a more rounding manner."

It was not invention to do what Jensen had done by widening the base of the tines, as Neider did, or by striking out a rib in the base, as Marggraff did. Jensen determined a bending point by weakening the metal at the point it was desired to make the bending point by cutting away some of the metal there. Neider did the same thing by adding metal below the point he wished to determine as the bending point. Marggraff reached the same result by striking out a rib at the base of the prongs, thus strengthening the prong there and determining a bending point above where the metal was weaker.

We agree with the court below in holding, that the Jensen patent, without considering other devices shown in the record, was an anticipation. What Neider did was the mechanical equivalent of what Jensen had done and taught.

Decree affirmed.

NOTE.—The following is the opinion of Cochran, District Judge, in the court below:

COCHRAN, District Judge. This suit is to enjoin infringement of certain letters patent and to obtain an accounting. The letters patent concerned are No. 630,553, granted August 8, 1899, to Fred A. Neider, and No. 695,468, granted March 18, 1902, to Frederick Marggraff, and subsequently assigned to complainant. They relate to buttons used in upholstery, known as "tufting buttons." Such buttons are so used to connect the cover and back of a cushion at the depressions therein in order to preserve the tufts. Said patents do not relate to tufting buttons in general, but only to a subordinate class thereof, and to a subordinate class of such subordinate class. The subordinate class of tufting buttons to a subordinate class of which the patents relate are known as "clenching buttons." They consist of a head, or, as it is more inaptly called, a "back," and two prongs; the latter projecting from the former. They made the connection aforesaid by being passed, prongs foremost, through said parts of the cushion and intervening material, if any, and then having the outer ends of the prongs bent over in opposite directions against the back, thus clenching the cover and back together. That subordinate class thereof are such as have the prongs integral with the back and are made out of sheet metal by stamping, except as to a cap covering the back. The utility of the inventions for which the patents were granted consists in overcoming the effect of a weakness in such buttons at the point where each prong unites with the back. This weakness is due to crystallization thereat, caused by the stamping process. Its effect is to make the button readily breakable at that point when or after the prongs are bent for the purpose of clenching, if such weakness is not in some way overcome.

Conceivably there are but three ways in which to overcome this weakness. One is to remove the crystallization, the cause of the weakness. Another is in some way to strengthen the button at that point otherwise than by removing the crystallization. A third is to prevent the force applied to the end of the

prongs in the process of clenching from reaching this point of weakness. The possibility of overcoming it in the first way is not mooted in this case, and there may be no such possibility. It is claimed by defendant that the invention of the patent overcomes it in the second of these two ways. In fact, and such is complainant's position, it overcomes it in the last way. This it does by providing another weak point in the course of the prongs at which they will bend, and thus stop said force before it reaches said point. It provides this other weak point by resolving each of the two prongs into two parts of different strength; that of greatest strength being next to the weak point sought to be guarded, and the weak point provided being at the union of those two parts. The Neider patent so resolves them in one way, and the Marggraff in another. Here our consideration of these two patents should part, and each should be taken up and disposed of in its turn.

The Neider patent—the earlier of the two—so resolves each of the prongs by dividing them into different widths; the part next to the back being of greater width than the outer part. It contains two claims, the second of which is alone relied on; the other being abandoned. It is in these words:

"2. The hereinbefore described tufting button, consisting of the cap, having clenching prongs projecting from its back; said clenching prongs having an enlarged base tapering to the parallel sides of the clenching prongs, substantially as shown and described."

It will be noted that the enlarged base is referred to as "tapering to," and the outer part of the prongs as having "parallel sides." These limitations, however, are hardly of the essence of the invention. Its essence consists in dividing each of the prongs into two parts of different strength, that of greater strength being nearest the back, and accomplishing this by enlarging the base of each prong. It is not said how the base is to be enlarged. The language used is broad enough to cover any method of enlargement. In the drawings and specifications, however, the method of enlargement described is that of making the base wider than the outer part. For convenience sake I will treat that as the method of enlargement called for by the patent. But, though the method of so resolving each prong into two parts of varying strength is referred to as an enlargement of the base, it might just as well have been referred to as a lessening of the width of the outer part.

The thing which the invention has in view is resolving each of the prongs into two parts of varying strength and of accomplishing this by making the two parts of different width. And the so doing can be described either as making one part of smaller width than the other or of greater width than the other. Each description fits the process—one as aptly as the other. It is because the claim in question describes it as enlarging the base that counsel for defendant have been led into the position that the way in which the invention undertakes to overcome the weakness due to crystallization at the junction of the prongs and the back is by strengthening the button at that point otherwise than by removing the crystallization. But this is not so. The button is not strengthened at that point. This is shown by the consideration that if two buttons, having prongs of equal width, are taken, and the outer parts of the prongs of one of them are clipped down so as to make them of smaller width than the base, such button will be stronger than the other and less liable to break because of the bending of the prongs in clenching. In so doing the bases, much less the weak points at their feet, are not strengthened. Simply a weak point in the body of such prong is provided by which the bending force may escape and never reach the weak point at its junction with the back.

There is nothing said in the claim as to how far from the back of the button this change in the width of the prongs—i. e., the point of division between the enlarged base and the outer part with the parallel sides—is to take place. So far as it is concerned, it may be located at any point between the back and the outer end of the prong. But the nature of the article and the uses to which it is put necessarily locate it not farther away from the back than the least thickness of material that is likely to be between the back of the button and the bent portion of the prongs after the buttons have been used; for otherwise they will not perform the function of clenching. It need not, how-

ever, be as far away as such thickness. The material around the prongs, particularly if supplemented by washers, as is the case in their use, save where used in what are termed "edge rows," supplies an external force which is sufficient in and of itself to provide a bending point, and thus prevent the bending force from reaching the weak point at the base of the prong. Indeed, owing to this circumstance, it seems to be established by the proof that the invention is of no value save in said edge rows, where no washers are used. and where the material is not of sufficient thickness to in itself provide a bending point far enough away from the weak point at the base of the prong to prevent the bending force from reaching it.

It is claimed that this Neider patent is invalid as to the second claim, as well as to the first claim, which has been abandoned. The foregoing will enable one to appreciate the grounds upon which it is claimed that it is invalid and determine their value. In the first place, it is urged that the claim of the patent that it provides a bending point in the prongs of the button—i. e., a definite point therein at which they will always bend—is untrue, and that, this being so, the only thing in the invention claimed to be meritorious is without any utility. It is undertaken to be made out that the patent does not define a bending point by the consideration that when the thickness of the material, supplemented by the washers around the prong, is greater than the distance of the outer end of the enlarged base of the prongs from the back of the button, the prongs will bend, not at said outer end thereof, but at the top of the washer, and as the distance of the top thereof varies in different cushions, and even in the same cushion, the prongs of the buttons have no well-defined bending point. Undoubtedly such is the case, and it is established by the evidence. But the claim of the patent is not as to the location of the bending point in the prongs when the button is in use, but before being used as they come out of the factory. At that time there can be no question that they do have a well-defined bending point, which exists in all of them, everything else being equal, and that point is the junction of the enlarged base and the outer and smaller part of the prong. Possibly language may be found in the specification tending to indicate that the claim was that when used there is a well-defined bending point at which, under all circumstances and conditions, the prongs bend, or at least showing that care was not taken to limit the claim as to the bending point to the time when the buttons have come out of the factory and before they have been put in use. But it could not have been intended to claim other than at such time and under such conditions the prongs of the buttons have such bending point, and such a construction must be given to the patent.

The question, then, as the utility of the patent resolves itself into this: Does the fact that such buttons, when not in use, have a well-defined bending point, located as heretofore indicated, render them of value when in use? Is this particular feature of them such as to better the making of cushions in upholstery? Of course, if in all instances the thickness between the back of the buttons and the bent portion of the prongs, by which same is clenched, is sufficient to provide a bending point far enough away from the weakness at the junction of the back and the prongs to prevent the bending force, when applied to the prongs in bending them, reaching such weakness or giving it effect, then such feature is of no utility and does not better the making of upholstery; for if, in the making of cushions, a means is always supplied, outside of the buttons, which provides a bending point in the prongs that guards the weakness at their base, why the necessity of anything in the buttons themselves to provide such a bending point? The evidence tends to show that such a means is supplied outside of the buttons in all cases where what are called "edge rows" are not concerned. There washers are invariably used, and the thickness of the material supplemented by the washers is such as to provide a bending point sufficiently far away from said weakness and of such a character as to guard it. It establishes, however, that where edge rows are concerned no washers are used, and the thickness of the material is not such as to provide a bending point of such a character, though it may be sufficiently far away, as to render such protection. This is made out by the testimony of the patentee and complainant's other witnesses as to the trouble with breakages before the invention and the freedom therefrom after the invention. This

evidence is not overthrown or affected by the testimony of defendant's witnesses as to freedom from breakages where such invention was not used. Where this testimony did not have to do with edge rows, it had no bearing on the matter of breakages where they were concerned; and where it did have to do with edge rows, it dealt only with Morely buttons. Such buttons are a subordinate class of clenching tufting buttons, separate and distinct from that class to which the patent in question relates. They have no weakness at the junction of the back and the prongs. The back and the prongs are not integral and are not made out of sheet metal by stamping. The Morely button has a papier-maché head and a metal prong, the latter being driven into the former.

The sole effect that can be given to defendant's said testimony is to confine the utility of the invention in question to the buttons when used in edge-row work. It can be given no greater effect that this. The invention in question is, therefore, such as to prevent breakages in edge-row work, and possibly, if not probably, at times in other work. It certainly does no harm in other than edge-row work, and does good there. Its utility there is sufficient to uphold the patent. That the invention has utility is shown by defendant's own conduct in relation to the manufacture of buttons, as shown by the witness Quehl, and to its own patent. In the specification thereof it is stated that the invention covered by the patent, which is imitative of complainant's, is such as to "cause the tongs to bend at a line 'a' some distance from the button head." It might be thought that the attempt of the defendant to get away from this concession is some what disingenuous.

The other two attacks made upon the second claim of the patent may be considered together. They are that it involved ordinary mechanical skill only —not patentable invention—and that, if it did involve patentable invention, it had been anticipated. As stated by counsel for complainant, the invention involved two ideas, to wit, a result to be accomplished and a means of accomplishing that result. The result to be accomplished was to protect or guard the weak point in the button at the foot of the prong against the bending force applied to its head in the process of clenching, and possibly subsequently, after the clenching has been completed, and whilst the cushion is in use. The means of accomplishing that result which it adopted involved two subordinate ideas. One was that the way to so protect or guard said weak point was to resolve the prong into two parts of different strength; that of greatest strength being located next to that point. The other was that the prong could and would be so resolved by making the base next to that point of greater width than the outer part. Now, all these ideas seem quite simple. It does not seem to require a great amount of skill to conceive the idea that a flat prong would be resolved into two parts of different strength by dividing it into two parts of different widths, or to conceive the idea that the weak point at the base of the prong would be protected or guarded by resolving the prong into two parts of different strength, with the part of greater strength next to that point, or even to conceive the idea that the way to prevent the bending force, when applied to the outer end of the prong in the process of clenching, from causing the prong to break at that point, is by protecting or guarding it from the attack of that force.

I hesitate, however, to hold that the invention involved no patentable invention, but only ordinary mechanical skill, and that for two distinct reasons: One is that I am conscious of the fact that my hindsight is better than my foresight. The other is I do not feel fully equipped to deal with such a question. I am not sufficiently familiar with the decisions where the question of patentable invention or ordinary mechanical skill was involved and decided to be so equipped. It is true that it has been said that the word "invention" cannot be defined, so as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not. But the cases are so many where that question has been up and decided, and that by able judges, that a reasonable familiarity with them must at least sharpen one's wits when he has a similar question to decide. The great thing to be done in all such cases is for one to place himself in sympathetic relation with the inventor at the time of the invention, and to speak from his standpoint at that time as to whether what he has done involved the exercise of the inven-

tive faculty or not; and to do this well and successfully he needs all the assistance obtainable. But I do not have to decide this question in this case, as I am constrained to hold that the invention was anticipated, and the patent is for this reason invalid. Hence I pass it by.

In passing upon the question of anticipation, it is important that one have a firm grasp of what the invention is, as I have heretofore pointed out. It is a certain means of protecting the weak point at the base of the prong against the attack of the bending force, and not strenghtening that point so as to enable it to withstand that force when attacked. These are two entirely distinct ideas. It is one thing to protect a position against attack. It is another thing to strengthen that position against attack, so as to enable it to withstand the attack when it comes upon it. That it is the former idea, and not the latter idea, which is involved in the invention in question, is settled by the consideration heretofore alluded to. That consideration is that if two buttons with prongs equally of uniform width from the back of the button to the point of the prongs are taken, and at a reasonable distance from the back of one of the buttons its prongs are clipped out to the point, thus changing the prongs into two parts of different width, with that of greatest width next to the foot of the prong, such button will be stronger and less liable to become broken than the other button. This is so, not because the prongs of that button have been strengthened at the foot thereof, but because in that case a bending point in the course of the prong has been provided, which will prevent the bending force from reaching the base of the prong and causing it to escape by that point. It is also settled by the consideration adduced by complainant's counsel. That consideration is that if two such buttons are taken, and the prongs of one of them are clipped on each side from the base to the point, thus making the prong a triangle in shape and consisting of but one part, with no well-defined bending point, such button will be but little, if any, stronger than the other, notwithstanding the fact that it is widest at its base. There is nothing in its course to stop the bending force from reaching the base.

With this distinction clearly in mind, we are in position to deal with the question of anticipation. The defendant has introduced a mass of articles and patents, which it is claimed on its behalf show anticipation. I do not find in them, however, any article and but one patent that shows anticipation. Possibly the finding of this one patent, which I consider to show anticipation has led me not to consider the articles and the other patents as carefully as I might otherwise have done. Certainly the bulk of them do not show anticipation. So far as they are concerned, they simply involve the idea of strengthening a weak point so as to enable the articles to withstand force when applied to that point. I do not find it necessary to take this up in detail and show that this is the case. Such is the case in the natural instance so much relied on—that of the tree. It is true that its trunk is largest at its junction with the roots, the limb is so at its junction with the trunk, the branch is so at its junction with the limb, and so on. But the idea there involved is that of protecting the weak point, which, in each instance, is at the junction of the part of greatest strength with that of less strength, by increasing the size of the latter at such junction, so as it may be enabled the better to withstand the force of the wind. There is no idea involved of protecting such point from an attack from such quarter.

As to the McGill and Pack & Van Horn fasteners, of which so much is made, they have no application whatever, in my judgment, to the case in hand. Being made of soft metal, there is no constitutional weakness in them at the base of the prong, and there is, therefore, no necessity of strengthening the fasteners at that point, or of protecting that point from the attack of the bending force, and so we find no device or arrangement in either fastener for either of such purposes. The tubular formation in the Pack & Van Horn fastener at the base of the prongs, which are no part of the prongs themselves, and lie between said base and the head or back of the fastener, is not there for any such purpose. They are there simply to provide an opening through the fastener, so as to enable the papers, through which it is passed, being strung upon a cord or hung upon a pin or bracket.

The patent to which reference is had as showing anticipation is the patent No. 377,029, granted to J. C. Jensen, January 31, 1888, for a paper fastener.

The device covered by that patent is formed by stamping from sheet metal. The prongs are cut from a blank so as to lie side by side, with a connecting bar between them, which is nearer one end of the prong than the other; that end being intended for the head of the fastener. In the inner edges of the prong, underneath the connecting bar, but near to it and opposite each other, notches are cut. These notches, according to the specification of the patent and the testimony of complainant's expert, weaken the prongs. After the blank is formed the fastener is made by bringing the two prongs face to face, by bending the connecting bar so as to lap one prong upon the other. After this the head is formed by bending the upper ends of the prongs above the connecting bar—called "half heads" in the patent—away from each other. With this the fastener is complete and ready for use. In use the lower end of the prongs are passed through the paper and then bent away from each other towards the paper. As theretofore constructed without the notches, it was found, as stated in the specification, that when securing together only a few sheets of paper, the prongs could not be bent back and up against the sheet, so as to lie in close contact therewith, as when the blow was made on the fastener, to secure the same tightly in place, one or both of the prongs would be given a sudden and sharp bend that would cause the prong, or prongs, to break when bent back to the original position for the purpose of removing the fastener. The breakage would be at the connecting bar. As stated by complainant's expert, the fastener would "tear across the bar," or by his counsel, the connecting bar would be "broken."

To prevent this the patentee invented the notch. He thus describes his invention: "My invention is designed to construct a metallic fastener that will overcome and obviate the difficulty above referred to; and its nature consists in providing a notch in each prong of the fastener below the strip, or piece connecting the prongs together, to allow of a square bending of the prongs." He further states that with the notches "the prongs can be turned back, so as to lie nearly parallel their full length to the head, instead of bending back in an arc of a circle, as in the fasteners heretofore constructed. This advantage is gained by the notches at the bending point, which slightly weaken the metal and allow of the nearly square bending of the prong, and by reason of this square bending the connecting piece is not so liable to become broken off as when the prongs are bent in a more rounding manner." As is well said by complainant's counsel: "The surplus metal in the width of the prongs, greater than at the notch, is mere surplusage." Of course he means the surplus in width from the notch out to the lower end of the prongs. With that surplus removed, what do we have? We have the prong divided into two parts of different strength by being made of different widths; the base being of greater width than the outer part, thus providing a weak point, a bending point, in the course of the prong at the junction of the two parts. We have also a weak point to be protected, to wit, the connecting bar, and that weak point is protected from the attack of the bending force by the location of the weak or bending point in the course of the prong between it and the end of the prong where the bending force is applied.

The only difference between this patent and the one in hand is that in the latter instance the weak point to be protected is at the base of the prong, whereas here it is at its side. This, however, is not a difference in essence. The two patents are essentially the same. The complainant's expert undertakes to differentiate the two patents by the difference between the heads of the two patents. I cannot see, however, anything in this to differentiate them, so as to make the one not an anticipation of the other. He states his conclusions in these words, as follows, to wit: "I am therefore of the opinion that the paper fastening devices shown and described in the Jensen patents, above mentioned, do not disclose or suggest the combination and arrangement of parts as recited in the Neider and Marggraff patents in suit, due to the prongs being notched or weakened, to determine the point at which they shall bend, and to prevent the bending operation from tearing the bar, which is the only point at which the prongs are united together, the absence of head sections shown in the Neider and Marggraff patents, and of the means shown and described in the Neider and Marggraff patents, for strengthening the point at which the root of the prong unites with such head section."

The presence of means in the Neider patent for strengthening the point at which the root of the prong unites with the head section is what defendant claims makes the mass of articles and patents introduced by it an anticipation. And it must be admitted that, if such means are present in the Neider patent, they are an anticipation. It is because I have found that there are no such means present in said patent at that point that I have been able to get rid of such anticipation. There are no means in the Neider patent for strengthening that point. The means provided thereby are to protect that point from the attacking force. As to the head section, as already stated, the difference between the two patents in this particular is no reason for the one not being an anticipation of the other. There the thing which is pointed out as distinguishing the Jensen patents is the very same thing which we find covered by the claim of the Neider patent in question herein, and which makes it of any utility.

I hesitate somewhat to hold that this patent is an anticipation, inasmuch as so little emphasis has been placed upon it by defendant's expert and counsel; but I cannot see it in any other light, and must so hold. I think I see anticipation, also, in the bow to which reference has been made by the defendant's counsel. The middle or center part thereof is thicker than each of the outer ends. The weak point in a bow of same width from end to end is, everything else being equal, at the center. There the two bending forces, applied at the outer ends and drawing in opposite directions, meet. By thickening the middle, they never meet. Two bending points are provided at either end of the middle portion, so that said bending forces do not meet. It is true that there is no constitutional weakness at the center of the bow, and the center is strengthened by the thickening, and it may be that the difference in strength has something to do with the efficiency of the bow in throwing the arrows; but involved, also, is the additional idea of preventing the bending forces reaching the center of the bow and thereby making what would otherwise be a weak point.

So much then as to the Neider patent. The only difference between it and the Marggraff patent is that the latter provides a different method of strengthening the base of the prongs, to wit. by the process of ribbing. There is room to say that the Neider patent is an anticipation of the Marggraff patent, in that the former covers any enlargement of the base, however made, and the ribbing process of the latter is an enlargement of the base. But, this aside, the method of increasing the strength of metal by ribbing is old. There is no invention, therefore, in increasing the strength of the base of the prong by ribbing, and thereby protecting the weak point in the prong at its base from the attack of the bending force. The Marggraff patent simply protects that point by increasing the strength of the base in another way, and that a way old and well known.

I am therefore constrained to hold the patents in suit invalid, and to direct that the bill be dismissed.